UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                          :
IN THE MATTER OF THE *EX PARTE*                               Misc. Case No.:____
APPLICATION OF PATOKH CHODIEV                             :
FOR AN ORDER TO TAKE DISCOVERY
PURSUANT TO 28 U.S.C. § 1782                              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


**MEMORANDUM OF LAW IN SUPPORT
OF *EX PARTE* APPLICATION OF PATOKH CHODIEV
FOR AN ORDER TO TAKE
DISCOVERY PURSUANT TO 28 U.S.C. § 1782**


**DIAMOND MCCARTHY LLP**
295 Madison Avenue, 11th Floor
New York, NY 10017
Phone: (212) 430-5400
Fax:  (212) 430-5499

333 South Hope Street, Suite 4050
Los Angeles, CA 90071
Phone: (424) 278-2335
Fax:  (424) 278-2339

*Attorneys for Applicant
Patokh Chodiev*

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................. 1
II. THE PARTIES................................................................................................... 4
III. RELEVANT BACKGROUND ........................................................................ 6

    A.  The World-Check Report on Mr. Chodiev ........................................... 6
    B.  The Laws of England and Wales Provide a Remedy to Mr. Chodiev for
        Refinitiv's Publication of the Report ..................................................... 8
    C.  Mr. Chodiev's Efforts Under the GDPR's Pre-Action Protocol for Media
        and Communication Claims.................................................................. 10
    D.  Mr. Chodiev Issued Data Subject Access Requests under the GDPR ............ 12

IV. ARGUMENT .................................................................................................. 18

    A.  The Application Meets Section 1782's Statutory Requirements. ..................... 19

        1.  Refinitiv US, LLC and Thomson Reuters Holdings Inc. Are Found
            in the Southern District of New York. .................................... 19

        2.  The Requested Discovery Is for Use in Proceedings Before a
            Foreign Tribunal. .................................................................... 19

            a)  The Foreign Proceedings Qualify for Assistance Pursuant to
                Section 1782..................................................................... 20
            b)  The Requested Discovery Is for Use in the Foreign
                Proceeding........................................................................ 21

        3.  As the Plaintiff in the Foreign Proceedings, Mr. Chodiev Is an
            "Interested Person". ............................................................... 22

    B.  *Intel's* Discretionary Factors Favor Granting the Application. ....................... 22

        1.  Section 1782 Is Available Because Thomson Reuters and Refinitiv
            US Are Not Contemplated to be Parties. ................................ 23

        2.  English Courts Are Receptive to the Requested Discovery.................. 26

        3.  The Application Does Not Circumvent Affirmative Proof-Gathering
            Restrictions. ........................................................................... 27

        4.  The Application Is Narrowly Tailored to Avoid Unnecessary
            Burdens in Accordance with the Federal Rules of Civil Procedure. ....27

V.  CONCLUSION................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
    785 F. Supp. 2d 434 (S.D.N.Y. 2011) ............................................................. 19, 22

*Anwar v. Fairfield Greenwich Ltd.*, 297 F.R.D. 223 (S.D.N.Y. 2013) ................................... 28

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76 (2d Cir. 2012)...................... 19

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113
    (2d Cir. 2015)............................................................................................. 20, 21

*Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095 (2d Cir. 1995)..................................... 24, 26

*Gushlak v. Gushlak*, 486 F. App'x 215 (2d Cir. 2012).................................................... 4

*In re Accent Delight Int'l Ltd.*, 791 F. App'x 247 (2d Cir. 2019) ....................................... 23

*In re Accent Delight*, 869 F.3d................................................................................ 21, 23

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
    121 F.3d 77 (2d Cir. 1997)............................................................................... 24

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery
    for Use in Foreign Proceedings*, 773 F.3d 456 (2d Cir. 2014)................................... 22

*In re Application of Shervin Pishevar for an Order to take Discovery for use in Foreign
    Proceedings Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290 (S.D.N.Y. 2020) ........... 26

*In re Application of Sveaas*, 249 F.R.D. 96 (S.D.N.Y. 2008) ............................................ 20, 28

*In re Ex parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517 (SDNY 2016).................... 28

*In re Hornbeam Corp.*, 722 F. App'x 7 (2d Cir. 2018) .................................................... 19, 20

*In re Kiobel*, No. 16 CIV. 7992 (AKH), 2017 WL 354183 (S.D.N.Y. Jan. 24, 2017)............. 20

*In re Malev Hungarian Airlines*, 964 F.2d 97 (2d Cir. 1992) ........................................... 23

*In re Mangouras*, No. 17-MC-172, 2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017)................. 26

*In re Postalis*, No. 18-MC-497 (JGK), 2018 WL 6725406 (S.D.N.Y. Dec. 20, 2018)........... 19

*In re Republic of Kazakhstan*, 110 F. Supp. 3d 512 (S.D.N.Y. 2015)................................. 26

*In re Vale S.A.*, No. 20MC199JGKOTW, 2020 WL 4048669 (S.D.N.Y. July 20, 2020)..20, 26

*In re Veiga*, 746 F. Supp. 2d 8 (D.D.C. 2010)..........................................................................20

*In re XPO Logistics, Inc.*, No. 15-MC-205 (LGS)(SN), 2017 WL 2226593 (S.D.N.Y. May 22, 2017).......................................................................................................................24

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004)..................................passim

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238 (2d Cir. 2018) ..........23

*Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95 (2d Cir. 2009).........................................24

*Mees v. Buiter*, 793 F.3d 291 (2d Cir. 2015) .............................................................21, 24, 27

*Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79 (2d. Cir 2004) ..........................22

## **Statutes**

28 U.S.C. § 1782..................................................................................................................passim

28 U.S.C. § 1782(a) .......................................................................................................4, 19, 22

## I.    INTRODUCTION

Applicant Patokh Chodiev, a successful international businessperson and philanthropist, submits this Application for leave to take discovery from Refinitiv US, LLC ("Refinitiv US") and its affiliated entity Thomson Reuters Holdings Inc. for use in contemplated foreign proceedings against Refinitiv Limited ("Refinitiv") arising from its publication in its commercial product, the World-Check Risk Intelligence Service database ("World-Check"), of a poorly supported and damaging report on Mr. Chodiev that has harmed and continues to harm him.

Refinitiv advertises World-Check as a service to businesses such as banks, accounting firms, and law firm to "[h]elp protect . . . business from financial crime and reduce risk by fulfilling . . . [Know Your Client] due diligence screening obligations with accurate and structured information."[1] But the August 2020 report ("Report") on Mr. Chodiev, without citation to any official or verified source, alleges that Mr. Chodiev is under investigation in France in connection with a decade-old political allegation while inexplicably failing to mention that an official Belgian investigation into the same matter cleared Mr. Chodiev; the Belgian investigation has been formally closed, exonerating Mr. Chodiev. The selective manner in which Refinitiv prepared the Report, and the baseless inferences it draws, has harmed Mr. Chodiev (and those related and associated with him) in both his business and personal activities.

When he learned of the impending publication of the Report, Mr. Chodiev, a Belgian citizen who has a residence in London and who has longstanding business interests there,

---

[1] https://www.refinitiv.com/en/products/world-check-kyc-screening.

promptly requested that Refinitiv, the publisher of World-Check in the United Kingdom, not publish the Report. When this request was denied and the Report published, Mr. Chodiev asked that the Report be removed, invoking the protections of the European Union's Greater Data Protection Regulation ("GDPR") and the United Kingdom's applicable implementing legislation, the Data Protection Act 2018 ("DPA"). The GDPR and DPA require that personal data be "(a) processed lawfully, fairly and in a transparent manner. . .," and "(b) accurate and, where necessary, kept up to date. . . ."[2] Mr. Chodiev further requested, pursuant to the GDPR and the DPA, that Refinitiv identify the personal data that Refinitiv and Thomson Reuters possessed and processed on him as well as information about how they processed his data (the "Data Subject Access Request").

Despite its legal obligations to process data fairly and accurately, Refinitiv refused to remove the Report and instead sought to justify its continued publication pointing to unsourced and unverified news articles (the veracity of which Mr. Chodiev disputed). Refinitiv refused to make a full production of documents responsive to his Data Subject Access Request, producing a heavily redacted subset of mostly irrelevant materials. Some of these documents were just excerpts of larger documents stripped of all relevant context; others were so heavily redacted as to be unintelligible. This limited production, however, does show that Refinitiv has relied on unverified articles from questionable sources. Further, it does show that, in deciding to publish the Report, Refinitiv appears to have done so in response to pressure from unidentified customers, who, as early as 2018, pushed Refinitiv to publish a negative report on Mr. Chodiev.

---

[2] Greater Data Protection Regulation ("GDPR"), European Union, May 25, 2018, found at https://gdpr-info.eu/art-5-gdpr/.

Refinitiv has used its corporate structure as an excuse to avoid fulfilling its obligations to provide a full and accurate response to Mr. Chodiev's Data Subject Access Request. Mr. Chodiev repeated his request to Refinitiv's corporate offices in the United Kingdom. But, after producing a handful of documents, the UK Refinitiv office directed Mr. Chodiev to a different department within Refinitiv, which, in turn, produced just one document. Refinitiv also stated that it could not produce any documents in the possession of its affiliate Thomson Reuters, pointing to a prior corporate transaction in which Thomson Reuters apparently sold its interest in World-Check. As a result, although Refinitiv appears to acknowledge that a number of additional documents exist that relate to the Report, it has failed to produce them, instead referring Mr. Chodiev to other companies.

Thus, Mr. Chodiev seeks information on the Report and the manner in which the Report came to be from Refinitiv's U.S. affiliate Refinitiv US and Thomson Reuters Holdings Inc., both of which have their U.S. headquarters and extensive operations in Manhattan. This information will assist in his contemplated proceeding against Refinitiv under the GDPR and DPA ("English Proceedings"). The GDPR and DPA allow affected individuals to file court proceedings to address misuse of their personal data. Given Refinitiv's refusal to comply with its legal obligations and the harm he has suffered, Mr. Chodiev seeks to know fully how his personal data is being processed to pursue the English Proceedings comprehensively and efficiently.

Section 1782 permits the "district court of the district in which a person resides or is found" to order the production of discovery "for use in a proceeding in a foreign or

international tribunal" upon the application of "any interested person."[3] Section 1782 encompasses reasonably contemplated proceedings as well. As set out in detail below, this Application meets those statutory requirements.

Mr. Chodiev's application is properly filed *ex parte*. As the Second Circuit has recognized, "it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*" because the entities from whom discovery is sought "can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."[4] This Application therefore does not prejudice the rights of Refinitiv US or Thomson Reuters.

## II.    THE PARTIES

The Applicant Mr. Chodiev is a Belgian citizen, who also maintains a residence and a family office in London, England.[5] He is a successful and respected international businessperson and philanthropist. He is a member of the Board of Directors of the Eurasian Resources Group ("ERG"), which is a leading diversified natural resources group.[6] ERG has a portfolio of production assets and development projects in 15 countries and employs more than 85,000 people globally.[7] Mr. Chodiev is also the founder of the International Chodiev Foundation, which since 1996 has worked tirelessly to transform the lives of young people around the world. It has managed more than 1,000 projects, in more than five countries worldwide.[8] Mr. Chodiev is originally from Central Asia and is Muslim.[9]

---

[3] 28 U.S.C. § 1782(a).
[4] *Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012).
[5] *See* Declaration of Kate Maguire ("Maguire Decl.") ¶ 3.
[6] *See* Maguire Decl. ¶ 3.
[7] https://www.eurasianresources.lu/en/pages/group-at-a-glance/group-at-a-glance.
[8] https://internationalchodievfoundation.com/about-icf/.
[9] *See* Maguire Decl. ¶ 3.

Refinitiv US is a financial and risk data limited liability corporation with its United States headquarters at 3 Times Square, New York, NY 10036.[10] Refinitiv US employs a team of over one thousand employees at their New York headquarters.[11] It maintains and regularly updates the World-Check database, which is used by entities such as financial institutions to determine the risk of doing business with certain individuals.[12]

Thomson Reuters Holdings Inc. is a professional services firm that collects and organizes information in a variety of areas and industries.[13] Thomson Reuters maintains its United States headquarters at 3 Times Square, New York, NY 10036.[14] In August 2020, Thomson Reuters still held a 45% interest in what is apparently the parent Refinitiv company.[15] Refinitiv has indicated, in response to Mr. Chodiev's requests for information, that Thomson Reuters has pertinent information, but Refinitiv refused to provide that information, stating that "our client cannot provide any data held by Thomson Reuters, given that Refinitiv Limited and Thomson Reuters are separate companies."[16]

---

[10] https://www.refinitiv.com/en/about-us; https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001772073&owner=include&count=40.

[11] https://www.refinitiv.com/en/careers/new-york.

[12] https://www.refinitiv.com/en/products/world-check-kyc-screening.

[13] https://www.thomsonreuters.com/en/about-us.html.

[14] *See* New York Department of State, Division of Corporations, Entity Information Database, Thomson Reuters Holdings Inc., available at https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_INFORMATION?p_token=3A0C8 858987900EB03C0D6C2662C673AF1D2518E5C2B575637C25370C49D94646AB2AFA7205A3E2FD C103AC41B16F854&p_nameid=C24F8A18CA9D5628&p_corpid=A98C0AAD72D62E54&p_captcha= 19927&p_captcha_check=3A0C8858987900EB03C0D6C2662C673AF1D2518E5C2B575637C25370C4 9D9464FE81D7A4CC6B12321F8D71E594845919&p_entity_name=thomson%20reuters%20holdings% 20inc&p_name_type=A&p_search_type=BEGINS&p_srch_results_page=0.

[15] https://www.reuters.com/article/lse-outlook/lse-expects-refinitiv-deal-to-close-in-first-quarter-2021-idUSKBN2780R4.

[16] *See* Watson Decl. ¶ 9, Ex. H (Refinitiv October 30, 2020 letter) at 4.

III.     **RELEVANT BACKGROUND**

A.      **The World-Check Report on Mr. Chodiev**

In August 2020, Refinitiv published the Report.[17] Inclusion in World Check's database is highly prejudicial because such a record carries an inference of a due diligence "red flag". Inclusion in World-Check cannot be "neutral". The short statement within the Report explaining why Mr. Chodiev is included in the database intimates that he has engaged in financial crimes. This negative inference is available to Refinitiv's customers around the world, which includes almost all global banks, financial institutions, professional services firms, and international agencies, and it is viewed as authoritative on the risks of doing business with someone. As World-Check itself states, "World-Check Risk Intelligence is used and trusted by the world's biggest companies."[18]

In this era of ever-increasing collection and interpretation of personal data and the corresponding ever-increasing reliance by businesses on such data, it is imperative that World-Check provide only accurate information and be held accountable when it does not. Given the serious adverse consequences of inclusion in World-Check and the fact that the service is marketed to, used by, and paid for by the "world's biggest companies", among others, World-Check should make a serious effort to verify the information it publishes and give careful consideration before publishing a report on an individual, especially when that individual provides a legitimate objection to the specific treatment of his personal data and challenges the reliability and sourcing of information used to create a negative report using that personal data.

As shown by the limited production made to date, Refinitiv apparently has few, if any,

---

[17] *See* Maguire Decl. ¶ 5, Ex. B (World-Check Report).
[18] https://www.refinitiv.com/en/products/world-check-kyc-screening.

publishing standards. Refinitiv apparently based the Report on three internet articles that cite only other internet articles.[19] These articles alleged, without corroboration or any source data, that France had opened an investigation into whether, nearly ten years prior, its officials had applied undue political influence on Belgium, purportedly for Mr. Chodiev's benefit. These articles do not purport to verify that such an investigation even exists. Indeed, they could not do so lawfully since French law makes judicial investigations confidential.[20]

In addition to entirely ignoring the presumption of innocence, the Report fails to make so much as passing mention that a previous Belgian parliament investigation into these alleged matters had cleared Mr. Chodiev.[21] The closure of the Belgian investigation is in fact available in a wide variety of easily accessible public materials including comments from official sources. Given World-Check's apparent choice to rely selectively on internet articles, the failure to take into account information clearing him of any conduct underscores the bias that exists in World-Check's methodology with which this Application is concerned.

The cherry-picking of unverified, unsourced negative information to the exclusion of official, positive information (which concerns the very same matters) is even more indefensible because Refinitiv has been on notice that Mr. Chodiev seeks to ensure that any information published about him is accurate. In fact, Refinitiv previously published a report on the Belgian investigation but removed it after Mr. Chodiev identified several issues with it, including that

---

[19] *See* Maguire Decl. ¶ 4, Ex. A (Refinitiv August 3 email).
[20] *See* CRIM. P. CODE art. 11 (Fr.), found at
https://www.legifrance.gouv.fr/download/pdf/legiOrKali?id=LEGITEXT000006071154.pdf&size=3,8%20Mo&pathToFile=/LEGI/TEXT/00/00/06/07/11/54/LEGITEXT000006071154/LEGITEXT000006071154.pdf&title=Code%20de%20proc%C3%A9dure%20p%C3%A9nale. An unofficial English translation of the French Criminal Procedure Code as of 2006 can be found at
https://www.legislationline.org/download/id/6381/file/France_CPC_am2006_en.pdf.
[21] *See* Maguire Decl. ¶ 6, Ex. C (Chodiev August 24, 2020 letter) at 4, 6.

Belgian parliament had cleared him of any wrongdoing. Refinitiv also previously mis-identified Mr. Chodiev as a "Politically Exposed Person" or "PEP", and ultimately removed that mis-identification.[22] Here, once again, Refinitiv has no verified information to justify maintaining the Report in World-Check despite Mr. Chodiev's request that it be removed.

The harm stemming from the Report has been significant, and it is continuing. Business counterparts of Mr. Chodiev make adverse inferences about him based on the Report. Corporate services providers, banks, law firms, audit and accountancy firms with which Mr. Chodiev works and which pay for access to World-Check learned about it as soon as it appeared and brought it to Mr. Chodiev's attention as an impediment to their business dealings with him.[23] Mr. Chodiev is being harmed in his business and personal activities, activities which are by their nature confidential. Should the Court so direct, Mr. Chodiev is prepared to submit a filing under seal explaining the damage that he has suffered as a result of the Report, and the anticipated future harm given its continued existence. There is also harm to Mr. Chodiev's immediate family members and their business interests from the Report's ripple effect.[24]

### B.     The Laws of England and Wales Provide a Remedy to Mr. Chodiev for Refinitiv's Publication of the Report

Recognizing the seriousness of unverified, inaccurate information on individuals being published in reckless disregard to an individual's right to privacy, the United Kingdom ratified a pan-European legislative initiative that prohibits mis-use of personal information. The Data Protection Act 2018 ("DPA"), which implements the European Union's General Data

---

[22] See Maguire Decl. ¶ 6, Ex. C (Chodiev August 24, 2020 letter) at 3–4.___
[23] *See* Maguire Decl. ¶ 7.
[24] *See* Maguire Decl. ¶ 7.

Protection Regulation (GDPR), operates to require organizations to safeguard personal data and to uphold the privacy rights of anyone in the European Union. The GDPR places a high burden on data controllers, such as World-Check which determines the purposes for which and the means by which personal data is processed.

Recognizing the importance of the GDPR, the United Kingdom has enacted legislation that gives the GDPR continuing effect in the United Kingdom post-Brexit.[25]

Together, the GDPR and the DPA impose obligations with respect to personal data, which is identified as "any information relating to an identified or identifiable natural person[.]"[26] Personal data includes data relating to "(a) the alleged commission of offences by the data subject, or (b) proceedings for an offence committed or alleged to have been committed by the data subject or the disposal of such proceedings, including sentencing."[27]

Article 5 of the GDPR (and the DPA) requires that there must exist a lawful basis for any "controller of personal data" to publish or maintain "personal data" and requires that the accuracy of the information contained therein be thoroughly vetted and removed if inaccurate.[28] Refinitiv admits that it falls under the auspices of these laws, stating that it "acts as a data controller of personal data as defined by data protection laws" for World-Check.[29]

The GDPR and the DPA further provide that a person can bring legal proceedings for

---

[25] Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019; Data Protection Act 2018; *see also* INFORMATION COMMISSIONER'S OFFICE, DATA PROTECTION AT THE END OF THE TRANSITION PERIOD 4 (Sept. 2019), https://ico.org.uk/media/for-organisations/data-protection-at-the-end-of-the-transition-period/data-protection-at-the-end-of-the-transition-period-1-0.pdf.

[26] GDPR art. 4(a), found at https://gdpr-info.eu/art-4-gdpr/; DPA § 5, found at https://www.legislation.gov.uk/ukpga/2018/12/section/5/enacted.

[27] DPA § 11, found at https://www.legislation.gov.uk/ukpga/2018/12/section/11/enacted.

[28] GDPR art. 5(1), found at https://gdpr-info.eu/art-5-gdpr/.

[29] https://thesource.refinitiv.com/thesource/getfile/index/8d79a91b-5177-4652-a25a-898490b657dd#:~:text=Refinitiv%20acts%20as%20a%20data%20controller%20of%20personal,as%20defined%20by%20data%20protection%20laws%20for%20the.

compensation against controllers of personal data who infringe the rights described above in the courts of a member state where the controller is located.[30] Refinitiv Limited is based in London so there exists prima facie jurisdiction before the High Court of England and Wales.[31] The GDPR also provides for a Pre-Action Protocol for Media and Communication Claims to try to resolve such claims short of formal legal proceedings. This Protocol has been exhausted by virtue of Mr. Chodiev's correspondence with, and articulation of his claims to, Refinitiv. There are no remaining technical requirements remaining before Mr. Chodiev can commence his proceeding.

### C. Mr. Chodiev's Efforts Under the GDPR's Pre-Action Protocol for Media and Communication Claims

On August 24, 2020, shortly after Refinitiv published the Report, Mr. Chodiev requested that Refinitiv remove it,[32] and, on September 11, 2020, Mr. Chodiev sent a "Letter Before Claim", which indicates how the Report violates his rights under the GDPR and the DPA.[33]

As the Letter Before Claim explains, the GDPR obligates Refinitiv, as a "controller," to (1) have a lawful basis for processing Mr. Chodiev's personal data in the Word-Check Report, and (2) take "every reasonable step" to ensure the accuracy of the World-Check Report. Yet, as set out in detail in the Letter Before Claim, the World-Check Report does not satisfy any of the lawful bases for processing Mr. Chodiev's personal data. Further, Refinitiv

---

[30] *See* GDPR art. 79, found at https://gdpr-info.eu/art-79-gdpr/; DPA §§ 167–169, found at https://www.legislation.gov.uk/ukpga/2018/12/part/3/chapter/4/crossheading/obligations-relating-to-personal-data-breaches/enacted.

[31] *See* GDPR art. 79, found at https://gdpr-info.eu/art-79-gdpr/; DPA § 180, found at https://www.legislation.gov.uk/ukpga/2018/12/section/180/enacted.

[32] *See* Maguire Decl. ¶ 6, Ex. C (Maguire August 24, 2020 letter) at 6.

[33] *See* Watson Decl. ¶ 6, Ex. E (Letter Before Claim).

did not take any steps, much less "every reasonable step," to ensure the World-Check Report's accuracy. Instead, Refinitiv just relied on unsubstantiated internet articles. Further, Mr. Chodiev invoked his right to the erasure of the World-Check Report under the GDPR and indicated that he intended to bring suit for violations of the GDPR and the DPA in English Courts.[34]

On September 25, 2020, Refinitiv responded to the Letter Before Claim and refused to remove the Report. Refinitiv asserted that its publication of the World-Check Report was lawful, and that the Report was "necessary for the legitimate interest of providing subscribers to World-Check information for the specific purpose of assisting them with their legal and regulatory requirements to undertake checks to protect the public from financial crime, fraud and serious misconduct or dishonesty."[35] This statement, however, is utterly inconsistent with Refinitiv's other public disclosures. While Refinitiv claims that its Report was "necessary" under the GDPR, Refinitiv at the same time acknowledges to its clients that the information is unreliable, advising these paying customers that they should not rely on information in the World-Check database without "undertaking independent checks to verify the information contained therein."[36]

Additionally, while Refinitiv claims on World-Check's website that "[i]t has hundreds of specialist researchers and analysts across the globe, adhering to the most stringent research guidelines as they collate information from reliable and reputable sources,"[37] it has acknowledged that it in fact simply parrots unreliable internet reports, without attempting to

---

[34] *See id.*
[35] *See* Watson Decl. ¶ 7, Ex. F (Refinitiv Response to Letter Before Claim).
[36] *See id.*
[37] https://www.refinitiv.com/en/products/world-check-kyc-screening.

verify or to subsequently update them. Refinitiv's multiple disclaimers and caveats point to the same conclusion. While falsely advertising its service as providing "accurate and structured information," it is in fact a very expensive version of Google that can in no way satisfy the requirements of the GDPR and the DPA.

###    D.    Mr. Chodiev Issued Data Subject Access Requests under the GDPR

Mr. Chodiev also issued Data Subject Access Requests[38] pursuant to Article 15 of the GDPR, which provides individuals the right to request a copy of any of their personal data held by a data controller. Article 15 requires Refinitiv to provide Mr. Chodiev a copy of information regarding (1) "the recipients or categories of recipient to whom the personal data have been or will be disclosed," (2) "the existence of automated decision-making, including . . . meaningful information about the logic involved[]as well as the significance and the envisaged consequences of such processing for the data subject," and (3) "where possible, the envisaged period for which the personal data will be stored, or, if not possible, the criteria used to determine that period."[39] The GDPR and DPA further impose an obligation on "joint controllers" of personal data to produce all documents in the other entity's possession.[40]

On October 30, 2020, Refinitiv responded to Mr. Chodiev's Data Subject Access Request, providing just thirteen documents.[41] It also directed Mr. Chodiev to a completely different division within the Refinitiv corporate structure, the Refinitiv Data Privacy Office.[42] In accordance with Refinitiv's letter, Mr. Chodiev followed up with the Data Privacy Office. But the Data Protection Office proved even less compliant than the division within Refinitiv

---

[38] *See* Watson Decl. ¶ 8, Ex. G (Mr. Chodiev data subject access requests).
[39] GDPR art. 15, found at https://gdpr-info.eu/art-15-gdpr/.
[40] GDPR art. 26, found at https://gdpr-info.eu/art-26-gdpr/.
[41] Watson Decl. ¶ 9.
[42] *See* Watson Decl. ¶ 9, Ex. H (Refinitiv October 23, 2020 Letter) at 4.

with which Mr. Chodiev initially communicated. It produced only one document, which showed an image of a database interface with Mr. Chodiev's name entered on it.[43] Such an inadequate production confirms that Refinitiv did not comply with its GDPR and DPA obligations.

On January 22, 2021, Refinitiv provided four more documents, one of which contained heavily redacted snippets from other emails.[44] On April 16, 2021, Mr. Chodiev sent a final letter to Refinitiv explaining that its refusal to comply with its obligations under the GDPR and DPA necessitated the instant application.[45] Refinitiv responded on April 28, 2021.[46]

The "production" by Refinitiv is woefully unsatisfactory and inconsistent with Refinitiv's obligations under the GDPR and English law. In seeking to justify its inadequate production, Refinitiv has made several claims, but its limited production undermines or contradicts those claims. For example, emails from 2020 show communications between Refinitiv's customer service personnel and Thomson Reuters' research team regarding Mr. Chodiev.[47] The time stamps on that email indicate involvement of employees in the United States.[48] Refinitiv claims that it cannot "provide any data held by Thomson Reuters, given that

---

[43] *See* Watson Decl. ¶ 12, Ex. N (Image produced by Refinitiv Data Privacy Office on December 3, 2020).

[44] Watson Decl. ¶ 13.

[45] *See* Watson Decl. ¶ 13, Ex. Q (Chodiev April 16, 2021 Letter).

[46] *See* Watson Decl. ¶ 15, Ex. R (Refinitiv April 28, 2021 Letter).

[47] *See* Watson Decl. ¶ 13, Ex. P (August 3, 2020 email).

[48] *See* Watson Decl. ¶ 13, Ex. P (Refinitiv August 3, 2020 email). Emails sent from Europe ordinarily use the European date format, which is Day/Month/Year, where emails sent from the United States ordinarily use the American date format, which is Month/Day/Year. For example, an email sent on May 1, 2021 from Europe would use 01 May 2021 in the date, whereas the same email from the United States would use 5/1/2021. Similarly, most emails sent from Europe use military time whereas emails sent from the United States use standard time. The top email in Exhibit P, sent from Refinitiv customer support, has 8/3/2020 8:22 PM as the time stamp. The use of the American date format and standard time suggest the email originated in the United States.

Refinitiv Limited and Thomson Reuters are separate companies."[49] And Refinitiv denies that Thomson Reuters has any "responsibility" for or "joint controllership of World-Check"[50] to avoid the obligations the GDPR and DPA impose on "joint controllers" of personal data.

Further, confirming the robust and continuing relationship between Refinitiv and Thomson Reuters, Thomson Reuters' 2019 Annual Report states that "Refinitiv agreed to provide Thomson Reuters with data center services through September 30, 2020 and various network services through September 30, 2021 (and we agreed to provide certain data center and network services to Refinitiv through those dates)."[51] Refinitiv attempts to downplay the import of this relationship by stating that it is "no secret that the groups' companies continue to provide data services to one another."[52]

Thus, despite the evidence that Refinitiv and Thomson Reuters do indeed have a "joint controllership" under the GDPR and DPA, Refinitiv refuses to produce documents or information in the possession of Thomson Reuters. In its latest communication, Refinitiv suggested that Mr. Chodiev "contact [Thomson Reuters] directly." Through this Application, Mr. Chodiev now seeks discovery regarding the Report directly from Thomson Reuters.

Similarly, Mr. Chodiev seeks discovery from Refinitiv's U.S. affiliate Refinitiv US. Refinitiv has, despite multiple requests, evaded production of its internal policies and procedures regarding selection of report subjects or data verification standards. In its January 22, 2021 letter, Refinitiv implicitly acknowledged the importance of such policies and

---

[49] *See* Watson Decl. ¶ 9, Ex. H (Refinitiv letter response to Mr. Chodiev data subject access requests).
[50] *See* Watson Decl., ¶ 15, Ex. R (Refinitiv April 29, 2021 Letter) at 1.
[51] Thomson Reuters, *2019 Annual Report*, at 17, found at https://ir.thomsonreuters.com/static-files/e16cf13e-228b-4abf-97f2-e626fda56871.
[52] *See* Watson Decl. ¶ 15, Ex. R (Refinitiv April 29, 2021 Letter) at 1.

procedures when it admitted that it needed to update its policies after it failed to produce documents responsive to Mr. Chodiev's Data Subject Access Requests.[53] And in its own marketing, Refinitiv touts the supposed rigor of its data verification processes.[54] But, when asked to produce its internal policies and procedures related to the publication of the Report, Refinitiv feigns uncertainty at the scope of the request and uses it as an excuse to produce nothing.[55]

Further, Refinitiv denies using any "automated decision-making", which would have triggered obligations under Article 15 of the GDPR.[56] But its documents discuss an automatic system to "score" articles regarding its data subjects.[57] While Refinitiv claims that it no longer provides these services,[58] Mr. Chodiev is entitled to more detail to understand why documents concerning him discuss scoring. Mr. Chodiev seeks this court's assistance to ensure that Refinitiv and Thomson Reuters produce all relevant documents.

The handful of documents that Refinitiv did produce raise additional questions about why Refinitiv would publish the Report given the unverified and contested basis for it. Was Refinitiv's decision to include him made in a manner required by the GDPR and the DPA? Or was it the product of an inappropriate process? On their face, the handful of documents produced suggest World-Check's process was not objective and other influences are at play. It appears that an unidentified Refinitiv customer or customers pressured Refinitiv to publish a negative Report on Mr. Chodiev. For example, a document named "Client Services

---

[53] *See* Watson Decl. ¶ 13, Ex. O (Refinitiv January 22, 2021 Letter) at 2.
[54] https://www.refinitiv.com/en/products/world-check-kyc-screening.
[55] *See* Watson Decl. ¶ 15, Ex. R (Refinitiv April 29, 2021 Letter) at 3.
[56] *See* Watson Decl. ¶ 11, Ex. M (Refinitiv November 23, 2020 Letter) at 3.
[57] *See* Watson Decl. ¶ 10, Ex. L (January 25, 2019 email).
[58] *See* Watson Decl. ¶ 15, Ex. R (Refinitiv April 29, 2021 Letter) at 2.

Communication 4", which was produced by Refinitiv in response to Mr. Chodiev's data requests, discusses a customer who was "concerned and very surprised" that Mr. Chodiev was not in the World-Check database because, according to that customer, Mr. Chodiev had "significant negative media…."[59] Helen Church, the Thomson Reuters representative dealing directly with that customer, pressed others in the organization for "specific reasons . . . as to why [Mr. Chodiev] doesn't fit the WC criteria" because "[t]he client [wa]s saying that there is a lot of negative news on him."[60] In March 2018, Refinitiv "looked into" a request for the inclusion of Mr. Chodiev "as a matter of priority" and "fast track[ed]" the matter.[61] The timing of this query and the need for acceleration are highly suspect. Indeed, if there was, in the client's assessment, negative media on Mr. Chodiev already available to the client, what would a Report accomplish? World-Check has not produced any documents responding to this client missive, and Mr. Chodiev maintains that it would be improbable for World-Check to proceed to publish a Report without further response to that request. Similarly, in April 2018, a second (unnamed) request was made to "create a World-Check profile for [Mr. Chodiev], as soon as possible."[62]

Internally, in a January 2019 email, a Refinitiv employee, whose name was redacted in the production, questioned what was occurring, stating, with regards to articles regarding Mr. Chodiev, that he or she "d[id] not follow how the logic of scoring was applied" and that it was "really hard to explain it[.]"[63] The same employee then asked whether it was "somehow

---

[59] *See* Watson Decl. ¶ 10, Ex. I (Client Services Communication 4).
[60] *See id.*
[61] *See* Watson Decl. ¶ 10, Ex. J (Client Services Communication 7).
[62] *See* Watson Decl. ¶ 10, Ex. K (Client Services Communication 8).
[63] *See* Watson Decl. ¶ 10, Ex. L (January 25, 2019 email)

possible to change the scoring for the article manually on request to make it appear in the screening[.]"[64]

Thus, it appears that Refinitiv cooperated, even "fast-track[ed]" a Report on Mr. Chodiev because a paying customer, apparently of Thomson Reuters, sought to have him included in World-Check. It is highly likely that such a paying customer is a commercial competitor to Mr. Chodiev. And it appears that Refinitiv agreed to act to please the customer, by making an exception to its scoring protocols and generating a Report on Mr. Chodiev. Mr. Chodiev is entitled to understand how his data was misused in the publication of the Report to be able to bring his claims against all relevant parties who sought to harm him through the publication of the Report.

Second, the inclusion in World-Check of Mr. Chodiev, who is Muslim and who is originally from Central Asia, for an allegation that is almost a decade old, for which he has already been investigated and cleared of any wrongdoing by a competent Belgian process, and which is based on select unverified and tautological internet articles, raises the question whether other factors, including his personal background, improperly contributed to Refinitiv's swiftness and lack of objective rigor when publishing the Report. In this respect, it is noted that World-Check has been reported to contain unsubstantiated negative reports against Muslim entities and persons.[65] This history includes multiple lawsuits or settlements

---

[64] *Id.*
[65] *See, e.g.*, Peter Oborne, *Thomson Reuters World-Check was wrong to designate the Palestinian Return Centre as "terrorist"* (March 5, 2018), found at https://www.middleeasteye.net/opinion/thomson-reuters-world-check-was-wrong-designate-palestinian-return-centre-terrorist; Al Jazeera, *Blacklist: Many Muslims listed by World-Check without evidence* (Oct. 22, 2019), found at https://www.aljazeera.com/news/2019/10/22/blacklist-many-muslims-listed-by-world-check-without-evidence.

against World-Check in England and elsewhere.[66] Does World-Check's process for including an individual differ based on a subject's ethnicity, nationality or religion?

Given the public reporting about World-Check's use of improper considerations, such as religion, Mr. Chodiev seeks limited, focused discovery to understand whether and how Refinitiv considers an individual's nationality, national origin, race, ethnicity, or religion when publishing reports. In response, Refinitiv ignores its prior, checkered history and dismisses these concerns in a single sentence, stating that the "suggestion …. that our client is '...biased against certain ethnic groups' is not only uncomfortable to read but it makes no sense."[67] Aside from the fact that Refinitiv does not actually deny the use of improper considerations, given that inclusion in World-Check can have devastating effects on a person, it is reasonable to inquire what policies and procedures Refinitiv – a company that provides services to over "40,000 institutions in approximately 190 countries"[68] – has to ensure against improper biases playing a part in its process.

## IV.   ARGUMENT

The Application meets the statutory requirements set forth in Section 1782 and the discretionary factors established by the U.S. Supreme Court's decision in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Copies of the proposed discovery, subpoenas for production of documents and subpoenas for deposition testimony, are attached

---

[66] *See* Quilliam International, *Maajid Nawaz Wins Legal Battle Against Thomson Reuters World Check* (Oct. 18, 2017), found at https://www.quilliaminternational.com/press-release-maajid-nawaz-wins-legal-battle-against-thomson-reuters-world-check/; Harriet Sherwood, The Guardian, *Finsbury Park mosque wins apology and damages from Thomson Reuters* (Feb. 1, 2017), found at https://www.theguardian.com/uk-news/2017/feb/01/finsbury-park-mosque-wins-apology-and-damages-from-reuters.
[67] *See* Watson Decl. ¶ 15, Ex. R (Refinitiv April 28, 2021 Letter) at 1.
[68] *See* https://www.refinitiv.com/en/locations and https://www.refinitiv.com/en.

to the accompanying Declaration of Thomas Watson.

**A.    The Application Meets Section 1782's Statutory Requirements.**

28 U.S.C. § 1782 authorizes this court to order discovery where "(1) 'the person from whom discovery is sought resides (or is found)' within the court's district, (2) 'the discovery is for use in a foreign proceeding before a foreign tribunal,' and (3) 'the application is made by a[n] . . . interested person.'"[69]

**1.    Refinitiv US, LLC and Thomson Reuters Holdings Inc. Are Found in the Southern District of New York.**

For the purposes of Section 1782, "[a] corporation is found in the district where it is incorporated or headquartered."[70] Here, both Refinitiv US, LLC and Thomson Reuters Holdings Inc. maintain their United States corporate headquarters and do business in Manhattan.[71] Accordingly, both are "found in" the Southern District of New York for the purposes of Section 1782.[72]

**2.    The Requested Discovery Is for Use in Proceedings Before a Foreign Tribunal.**

The requested discovery is "for use in a proceeding in a foreign or international tribunal," specifically in the English Proceedings before English courts in the United Kingdom to enforce Mr. Chodiev's rights under the GDPR and the DPA.[73] Courts describe the burden

---

[69] *In re Hornbeam Corp.*, 722 F. App'x 7, 9 (2d Cir. 2018) (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)).
[70] *In re Postalis*, No. 18-MC-497 (JGK), 2018 WL 6725406, at *3 n.4 (S.D.N.Y. Dec. 20, 2018).
[71] See https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001772073&owner=include&count=40 (for Refinitiv US, LLC) and NYS Department of State Entity Information, *Thomson Reuters Holdings Inc.* (Nov. 20, 2020)_(for Thomson Reuters Holdings Inc.), respectively.
[72] *See Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011).
[73] *See* 28 U.S.C. § 1782(a); *see also* Maguire Decl. ¶ 8

to satisfy this requirement as "de minimis."[74] As the Supreme Court recognized in *Intel*, the foreign proceeding need only be within "reasonable contemplation" to meet the statutory requirement. 542 U.S. at 259. As set out below, the Application satisfies this requirement because the requested discovery is "for use" in a Foreign Proceeding within reasonable contemplation.

> **a)      The Foreign Proceedings Qualify for Assistance Pursuant to Section 1782.**

The contemplated proceeding under the GDPR and the DPA is a civil action before the courts of England, and therefore undoubtedly qualifies as a "proceeding before [] foreign or international tribunal[s]" under Section 1782.[75]

Furthermore, contemplated proceedings satisfy the requirements of § 1782. A proceeding is within "reasonable contemplation" if there is "some objective indicium that the action is being contemplated."[76] Courts in the Second Circuit have found such indicia to be present where an applicant submitted "liability letters" to the contemplated defendant,[77] and where an applicant "articulate[d] a theory on which it intend[s] to litigate."[78] These indicia are present here. Mr. Chodiev submitted the Letter Before Claim to Refinitiv outlining Refinitiv's violations of the GDPR and the DPA and giving notice of his intent to file suit in the matter.[79]

---

[74] *In re Veiga*, 746 F. Supp. 2d 8 (D.D.C. 2010); *see also In re Application of Sveaas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008) (describing the "standard by which a court evaluates the relevance of discoverable materials" in a Section 1782 motion as "broadly permissive").

[75] *See, e.g., In re Vale S.A*., No. 20MC199JGKOTW, 2020 WL 4048669, at *3, 4 (S.D.N.Y. July 20, 2020).

[76] *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 123-24 (2d Cir. 2015).

[77] *In re Kiobel*, No. 16 CIV. 7992 (AKH), 2017 WL 354183, *3 (S.D.N.Y. Jan. 24, 2017), *reversed on other grounds sub nom. Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238 (2d Cir. 2018).

[78] *In re Hornbeam Corp.*, 722 F. App'x 7, 10 (2d Cir. 2018).

[79] *See* Watson Decl. ¶ 7, Ex. F (Refinitiv response to Letter Before Claim).

He has fully exhausted the Pre-Action Protocol. He has made constructive efforts to engage for one last time by a letter sent on April 16, 2021 which has gone unanswered.[80] Due to Refinitiv's repeated failures to comply with the GDPR and DPA, Mr. Chodiev plans to commence litigation against Refinitiv in the UK.[81] Thus, the contemplated proceeding in English courts has progressed well beyond "just a twinkle in counsel's eye," and meets the standard for a foreign proceeding under Section 1782.[82]

<b>b)      The Requested Discovery Is for Use in the Foreign Proceeding.</b>

The requested discovery is "for use" in the Foreign Proceedings, because it will "be used" at "some stage" of the proceeding.[83] To satisfy this aspect of Section 1782's "for use" requirement, the discovery need only "be employed with some advantage or serve some use in the proceeding."[84] The "focus" of this requirement, therefore, is "on the practical ability of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal."[85] As explained above, the information sought goes to the key issue in the contemplated English proceeding: whether Refinitiv's use of Mr. Chodiev's personal data was in the public interest or was being used subject to overriding legitimate interests, and whether it was used in a manner requested by commercial competitors who sought to cause Mr. Chodiev harm. Mr. Chodiev will have opportunity to use the requested discovery to prepare witnesses, conduct further discovery, and ultimately present his case against all relevant

---

[80] *See* Watson Decl. ¶ 14, Ex. Q (Chodiev April 16, 2021 Letter).
[81] *See* Maguire Decl. ¶ 8.
[82] *KPMG*, 798 F.3d at 124.
[83] *Mees v. Buiter*, 793 F.3d 291, 301 (2d Cir. 2015).
[84] *Id*. at 298.
[85] *In re Accent Delight*, 869 F.3d at 131.

parties.[86] Accordingly, this Application satisfies the "for use" prong.

### 3. As the Plaintiff in the Foreign Proceedings, Mr. Chodiev Is an "Interested Person".

Mr. Chodiev qualifies as an "interested person" because he is the plaintiff in the contemplated English Proceeding. As the U.S. Supreme Court stated in *Intel*, "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782[.]"[87]

### B. *Intel's* Discretionary Factors Favor Granting the Application.

Once Section 1782's "statutory requirements are met, a district court is free to grant discovery in its discretion."[88] To guide district courts in the exercise of this discretion, the Supreme Court in *Intel* laid out four non-exclusive factors that may be considered:

(1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";

(2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the request is "unduly intrusive or

---

[86] *See* Watson Decl. ¶ 16.

[87] *See Intel*, 542 U.S. at 256; *accord Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011).

[88] *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 460 (2d Cir. 2014) (quoting *Schmitz v. Bernstein Liebhard & Lifshitz LLP*, 376 F.3d 79, 83 (2d. Cir 2004)).

burdensome."[89]

In engaging in this analysis, the Second Circuit teaches that courts should look to the statute's twin aims: "efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts."[90] Here, all four *Intel* factors counsel in favor of granting the requested discovery.

1.   **Section 1782 Is Available Because Thomson Reuters and Refinitiv US Are Not Contemplated to be Parties.**

Thomson Reuters is not presently contemplated to be a party to the foreign proceeding as articulated in the pre-action correspondence to date, and Refinitiv's corporate office in the United Kingdom has made clear that it will not produce any Thomson Reuters documents. Similarly, Refinitiv US is not presently contemplated to be a party to the foreign proceedings. Discovery under Section 1782 is generally available when the party from which discovery is sought is a "nonparticipant in the matter arising abroad."[91] Therefore, the first *Intel* factor supports the requested discovery from Thomson Reuters.

Refinitiv US's affiliate Refinitiv is contemplated to be a party to the English Proceedings. However, this too poses no impediment to the discovery sought here. A court may order discovery under Section 1782 even if the party from which discovery is sought would be a party in the foreign proceeding and even if "the foreign court theoretically could

---

[89] *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238 (2d Cir. 2018) (quoting *Intel*, 542 U.S. at 264-65).

[90] *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 134 (2d Cir. 2017) (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).

[91] *Intel*, 542 U.S. at 264; *see also In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d Cir. 2019) ("The district court correctly found that Sotheby's is not a party to the Monaco proceeding for which the Petitioners seek discovery. It was thus within its discretion to find that Petitioners satisfied the first Intel factor.").

order the parties to produce the requested evidence."[92] In *In re XPO Logistics, Inc.,* the Southern District of New York granted a 1782 motion for discovery against XPO even though "XPO, of course, is a participant in the French litigation at issue in this case" and the court-appointed French expert would "ha[ve] at least some means of acquiring documents relevant to his or her mission[.]"[93]

Nor is there any requirement to show that the desired discovery is unavailable in the foreign proceeding prior to filing a Section 1782 motion. In *Mees*, the Second Circuit rejected a "quasi-exhaustion requirement" as a "precondition for discovery under § 1782."[94] In *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, the Second Circuit stated that "a district court may not refuse a request for discovery pursuant to § 1782 because a foreign tribunal has not yet had the opportunity to consider the discovery request."[95] And in *Euromepa S.A.*, the Second Circuit held that, "[r]elying on the plain language of the statute, this Court has also refused to engraft a quasi-exhaustion requirement onto section 1782 that would force litigants to seek information through the foreign or international tribunal before requesting discovery from the district court."[96]

Here, any such quasi-exhaustion requirement would not only run counter to controlling authority in this Circuit, but it would also impede Mr. Chodiev's purpose in seeking the documents here. Refinitiv's limited production indicates that employees in the United States

---

[92] *Marubeni Am. Corp. v. LBA Y.K.*, 335 F. App'x 95, 98 (2d Cir. 2009).

[93] *In re XPO Logistics, Inc.*, No. 15-MC-205 (LGS)(SN), 2017 WL 2226593, at *5, 6, 12 (S.D.N.Y. May 22, 2017), *aff'd*, No. 15 MISC. 205 (LGS), 2017 WL 6343689 (S.D.N.Y. Dec. 11, 2017).

[94] *Mees*, 793 F.3d at 303.

[95] *In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997).

[96] *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1098 (2d Cir. 1995) (internal quotation marks and citations omitted).

were involved in the collection of data regarding Mr. Chodiev and the publication of the Report, so there are likely relevant documents located in Refinitiv's U.S. headquarters in New York that Refinitiv has refused to produce. Through this motion, Mr. Chodiev seeks to obtain documents in the Southern District of New York or within the custody or control of custodians here and to do so expeditiously to assist in his contemplated proceeding in the U.K.

Moreover, Refinitiv has made clear that it does not believe it has an obligation to produce any additional documents beyond the few documents already produced.[97] It has already used its corporate structure and divisions to minimize and to try to escape its legal obligations, has refused to produce documents outside its immediate possession even where they are clearly accessible to it, and has failed to thoroughly search its systems for documents. Refinitiv has even admitted that its processes are inadequate. In these circumstances, Mr. Chodiev is justifiably concerned that Refinitiv's corporate office in the United Kingdom has not in fact searched for and produced relevant documents and communications maintained in systems in the United States. Given the need to learn relevant information derived from these documents as quickly as possible, the existing delay already caused by Refinitiv, and numerous indicia that relevant information is in the possession, custody, or control of entities in the Southern District, Section 1782 is appropriate. It would allow Mr. Chodiev to expeditiously receive documents from Refinitiv US, LLC, which would finally permit Mr. Chodiev to pursue comprehensively and efficiently his contemplated proceeding in the English courts against all relevant parties. Therefore, this *Intel* factor, in total, supports the discovery sought here.

---

[97] *See* Watson Decl. ¶ 13, Ex. O (Refinitiv January 22, 2021 Letter) at 3.

### 2.      English Courts Are Receptive to the Requested Discovery.

The Application is also favored by the second *Intel* factor, which "take[s] into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance."[98] In examining this factor, the Second Circuit has made clear "that an extensive examination of foreign law regarding the existence and extent of discovery in the forum country is [not] desirable," and has therefore held that "a district court's inquiry into the discoverability of requested materials should consider only authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782."[99] Indeed, "[a]bsent 'a forum country's judicial, executive or legislative declarations that specifically address the use of evidence gathered under foreign procedures,' a district court should lean toward disclosure[.]"[100]

Courts in this District have found that English courts are receptive to the assistance of U.S. courts pursuant to Section 1782.[101] For example, just this past year, in *In re Vale S.A.*, the court granted 1782 discovery and found that "the High Court [of Justice, Business and Property Courts of England and Wales, Commercial Court] would be receptive to this Court's assistance and there is no evidence to the contrary."[102] Absent any indication, much less "authoritative proof," that an English court would reject the requested discovery, this factor weighs in favor

---

[98] *Intel*, 542 U.S. at 244.
[99] *See In re Republic of Kazakhstan*, 110 F. Supp. 3d 512, 517 (S.D.N.Y. 2015) (quoting *Application of Euromepa, S.A.*, 51 F.3d 1095, 1099–1100 (2d Cir. 1995)).
[100] *In re Mangouras*, No. 17-MC-172, 2017 WL 4990655, at *7 (S.D.N.Y. Oct. 30, 2017) (quoting *Euromepa*, 51 F.3d at 1100).
[101] *See, e.g., In re Application of Shervin Pishevar for an Order to take Discovery for use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782*, 439 F. Supp. 3d 290, 303–04 (S.D.N.Y. 2020).
[102] *In re Vale S.A.,* No. 20- mc-199 (JGK) (OTW), 2020 WL 4048669, at *4 (S.D.N.Y. July 20, 2020).

of granting the Application.

### 3. The Application Does Not Circumvent Affirmative Proof-Gathering Restrictions.

The Application does not "conceal[] an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States."[103] This factor concerns whether granting an application would circumvent "proof-gathering restrictions," that is, "rules akin to privileges that prohibit the acquisition or use of certain materials."[104] Absent the existence of such an affirmative restriction, "a [Section] 1782 application should not be rejected on the ground that the discovery would not be available in the foreign proceedings.…. That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means."[105]

The discovery sought here is consistent with the information that the GDPR/DPA obligates Refinitiv Limited to produce. Approving discovery from Refinitiv's affiliates is therefore consistent with English law, would be in the interests of justice, and would not circumvent any English laws, policies, or proof-gathering restrictions.

### 4. The Application Is Narrowly Tailored to Avoid Unnecessary Burdens in Accordance with the Federal Rules of Civil Procedure.

Finally, the requested discovery would not be "unduly intrusive or burdensome."[106] Courts in the Second Circuit assess this factor "by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure."[107] Accordingly, "the Court must balance the interests served by demanding compliance with the subpoena against the interests furthered by quashing

---

[103] *Intel*, 542 U.S. at 244-45.
[104] *Mees*, 793 F.3d at 303 n.20.
[105] *Id.*
[106] *Intel*, 542 U.S. at 265.
[107] *Mees*, 793 F.3d at 302.

it."[108] "[I]nconvenience alone will not justify an order to quash a subpoena that seeks potentially relevant testimony."[109] As long as there is "'any possibility' that the information sought may be relevant," the courts should be "broadly permissive" in granting discovery.[110]

Here, the discovery requests are narrowly tailored to the issues relevant to the contemplated English Proceedings, and Refinitiv and Thomson Reuters are likely to routinely maintain the materials and information requested. Therefore, compliance with the subpoenas would not be unduly intrusive or burdensome.

Mr. Chodiev seeks information from Refinitiv US and Thomson Reuters, including information from the period prior to its divestment of Refinitiv, that is highly relevant to the contemplated proceeding and that will enable a comprehensive articulation of his claims: (1) the decision to publish a report on Mr. Chodiev, (2) the specific persons who pressured Refinitiv to publish the Report on Mr. Chodiev, (3) policies and procedures regarding selection of a subject for a World-Check report, (4) due diligence done before and after the publication of the Report on Mr. Chodiev, (5) policies and procedures regarding pre- and post-publication due diligence procedures, (6) the marketing and use of Refinitiv's World-Check data by its customers, and (7) the relationship between Refinitiv and Thomson Reuters as it relates to the World-Check database.[111]

As discussed above, key issues in the English Proceedings will be whether the Report on Mr. Chodiev is "necessary", whether there was a legitimate basis to publish it, whether any

---

[108] *In re Ex parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 522 (SDNY 2016) (quoting *Anwar v. Fairfield Greenwich Ltd.*, 297 F.R.D. 223, 226 (S.D.N.Y. 2013)).
[109] *Id*. (quoting *Anwar*, 297 F.R.D. at 226).
[110] *In re Application of Sveaas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008).
[111] *See* Watson Decl. ¶¶ 1–4, Exs. A–D.

improper factors were considered in publishing it, and whether the proper due diligence was conducted to verify the content of the report. The requests are therefore tailored to the key issues present in the contemplated English Proceedings and the final discretionary factor in the *Intel* analysis supports the granting of Mr. Chodiev's Application.

\* \* \*

Consideration of all the factors identified by the Supreme Court in *Intel* therefore favors this Court's granting Mr. Chodiev's Application pursuant to Section 1782.

## V.    CONCLUSION

For the foregoing reasons, Mr. Chodiev respectfully requests that this Court grant this application and issue an Order as follows:

1.      Granting this application for discovery;

2.      Granting permission for Mr. Chodiev to issue the subpoena for documents to Refinitiv US, LLC in substantially the same form as it appears attached as Exhibit A to the Declaration of Thomas Watson;

3.      Granting permission for Mr. Chodiev to issue the subpoena for deposition testimony to Refinitiv US, LLC in substantially the same form as it appears attached as Exhibit B to the Declaration of Thomas Watson;

4.      Granting permission for Mr. Chodiev to issue the subpoena for documents to Thomson Reuters Holdings Inc. in substantially the same form as it appears attached as Exhibit C to the Declaration of Thomas Watson; and

5.      Granting permission for Mr. Chodiev to issue the subpoena for deposition testimony to Thomson Reuter Holdings Inc. in substantially the same form as it appears attached as Exhibit D to the Declaration of Thomas Watson.

Dated: New York, New York
       May 3, 2021

Respectfully submitted,

**DIAMOND MCCARTHY LLP**
*Attorneys for Applicant, Patokh Chodiev*

By:_____
        Robert W. Mockler, Esq.
295 Madison Avenue, 11th Floor
New York, NY 10017
Phone: (212) 430-5439
Fax:  (212) 430-5499
*robert.mockler@diamondmccarthy.com*

Thomas Watson, Esq. (*pro hac vice forthcoming*)
 333 South Hope Street, Suite 4050
Los Angeles, CA 90071
Phone: (424) 278-2335
Fax:  (424) 278-2339
*thomas.watson@diamondmccarthy.com*