# EXHIBIT E

# DIAMOND McCARTHY LLP
Attorneys & Counselors

295 Madison Avenue | 27th Floor | New York, NY 10017 | Phone: 212-430-5400

Writer's E-Mail Address
Juliya.Arbisman@diamondmccarthy.com
Writer's Direct Dial: +1-202-725-7667

11 September 2020

BY EMAIL

Ms Deborah Kemp
World Check/Thomson Reuters
Deborah.kemp@thomsonreuters.com
contact@world-check.com

**URGENT – REPLY REQUIRED BY 4PM ON 18 SEPTEMBER 2020**

**LETTER BEFORE CLAIM**

Dear Ms Kemp,

**Re: Request to delete the World Check record for Patokh Chodiev, a citizen of Belgium (as published on 17th August 2020) ("Report")**

1. We act for Mr Patokh Chodiev, a citizen of Belgium ("Mr Chodiev").

2. We are contacting you in accordance with the Pre-Action Protocol for Media and Communication Claims.[1] Given the urgency of this matter, and in light of the fact that you are already aware of the issues from prior correspondence held between yourself and our client's General Counsel, Ms Kate Maguire, we require a response by 4pm on Friday, 18 September 2020.

3. In 2014, World Check published incorrect information about Mr Chodiev which was retracted after our client's complaint. World Check is now making a similar error.

4. World Check's latest breach of Mr Chodiev's rights began on 3 August 2020 and is continuing as at the date of this letter. You informed Ms Maguire regarding World Check's intentions to reinstate a record of Mr Chodiev in the World Check database on 3 August

---

[1] https://www.justice.gov.uk/courts/procedure-rules/civil/protocol/prot_def

1

**DIAMOND MCCARTHY LLP**

September 11, 2020
Page 2

    2020 (the "Report"). This Report would contain Mr Chodiev's personal information, such as his birth date, and additionally state the following: "*Sep 2019 – reportedly indicted by the Prosecutor in Paris for laundering of tax fraud (EUR800,000) and (EUR5m) (2010-2011) (Kazakhgate Case). Investigation ongoing. Aug 2020 – no further information reported.*" In support of their Report, World Check provided a total of three articles from: *Le Soir*,[2] *L'Echo*,[3] and *AzBig Media*.[4]

5. On 7 August 2020, Ms Maguire sent you a letter objecting, *inter alia*, to the use of the word "*indicted*" in the intended Report due to its obsoleteness, and the incorrect translation from French to English leading to the generation of a factually incorrect record. Ms Maguire specifically requested World Check not to reinstate the Report, given the inaccuracy and mistranslation leading to a lack of justification for its reinstatement in the World Check database. You responded to this letter on 11 August 2020 proposing to amend the Report by merely replacing the word "indicted" with "judicial investigation" as follows: "*Sep 2019 - reportedly under judicial investigation by the Prosecutor in Paris for laundering of tax fraud (EUR800,000) and (EUR5m) (2010-2011) (Kazakhgate Case). Investigation ongoing. Aug 2020 - no further information reported.*" In the same email, you required Ms Maguire to provide comments within the next 3 business days before World Check proceeded with the reinstatement of the Report.

6. Three days was insufficient time to respond. Ms Maguire was required to travel from France in order to return to the UK before Covid-19 quarantine regulations were imposed. Ms Maguire was not working during that time and was unable to respond within the unreasonably short time provided to her to respond. On 17 August 2020, when Ms Maguire finally had access to her email, she wrote to World Check requesting to be granted another 3 business days to respond. However, ignoring her request, World Check reinstated the Report on 17 August 2020.

7. On 24 August 2020, Ms Maguire sent a second letter to you. The letter set out in detail the reasons behind the three articles initially provided by you did not represent complete or even factually correct information regarding Mr Chodiev's involvement in the so-called "Kazakhgate" matter. Ms Maguire further objected to the Report's reinstatement as it violated Mr Chodiev's rights under the General Data Protection Regulation ("**GDPR**") and invoked Article 17 and 21 of the GDPR in formally objecting to the Report and asserting Mr Chodiev's right to its erasure.

8. You responded with an unsubstantiated email on 26 August 2020 denying the removal of the Report. In your email, you provided four more news articles allegedly supporting the

---

[2] https://www.lesoir.be/249703/article/2019-09-26/kazakhgate-lhomme-daffaires-patokh-chodiev-est-inculpe-en-france-pour.
[3] https://www.lecho.be/economie-politique/belgique/economie/patokh-chodiev-inculpe-en-france-pour-blanchiment/10166096.html.
[4] https://azbigmedia.com/business/patokh-chodiev-biography-of-a-successful-businessman/.

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 3

Report from the following sources: *Le Soir*,[5] *rtbf*,[6] *7sur7*,[7] and *Le Vif*.[8]

9. You suggested that World Check would not remove the Report until each article offered in support was removed from the public domain. Your letter was silent about how these sources were credible for the purposes of justifying the reinstatement of an inaccurate report. It is noteworthy that it was also silent about an indication given in Ms Maguire's 24 August letter that any information about a reportedly ongoing French investigation requires to be strictly confidential under French law. World Check has been put on notice of this legal requirement and persisted to publish the Report, which is based not only on incorrect or false information but is also based on unlawfully obtained information. You attempted to justify the reinstatement of the Report on the basis that Ms Maguire "*d[id] not appear to deny that an enquiry is ongoing*," and stated that World Check would be prepared to review the Report if Ms Maguire "*provide[d] [World Check] with any official documentation which confirms the enquiry against [Mr Chodiev] has been closed in due course*." Mr Chodiev is not obliged to provide World Check with any legal documents. You again demonstrated World Check's continuing disregard for French law mandating the confidentiality of any investigations. Further, it is unacceptable that World Check requires "*official documentation*" to justify removal of the Report yet such proof is not required to merit publishing it in the first instance. This approach is in stark contrast to World Check's claim that it maintains high research standards designed to ensure the accuracy and relevance of the personal data on World Check. Indeed, none of the articles cited by World Check state that they were based on "*official documentation*" or otherwise identify the source of the alleged information published. Without any explanation or engagement with the very serious points on which World Check was put on notice, you concluded your email by dismissing Mr Chodiev's right to erasure as "not absolute".

10. Apart from your statement that "*the right to be forgotten under the GDPR is not absolute, and will depend on the circumstances of each individual case*," you offered no explanation of why the circumstances of Mr Chodiev's case militated against erasure nor did you explain why these particular articles (rather than others which have been published but ignored by World Check) were considered authoritative and in the public interest. Instead of responding cogently on these two issues, you repeated a generic statement from World Check's Privacy Statement. You claimed that World Check considered it appropriate to retain the information to assist its clients. A responsible data controller would need to consider how unsubstantiated and unproven allegations regarding events from almost ten years ago which wrongfully implicate Mr Chodiev would, in fact, assist its clients. World Check did not provide an explanation that it did so, and it is clear that it has not considered

---

[5] https://plus.lesoir.be/249682/article/2019-09-26/kazakhgate-patokh-chodiev-est-inculpe-en-france.
[6] https://www.rtbf.be/info/societe/detail_kazakhgate-la-justice-francaise-relance-l-enquete-sur-la-trace-des-enveloppes?id=10325678.
[7] https://www.7sur7.be/belgique/kazakhgate-patokh-chodiev-a-ete-inculpe-en-france-pour-blanchiment-de-fraude-fiscale~a32a60b4/?referrer=https://www.google.com/.
[8] https://www.levif.be/actualite/europe/kazakhgate-patokh-chodiev-mis-en-examen/article-normal-1195447.html?cookie_check=1598346283.

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 4

    this. For World Check to state that its customers' interests outweigh those of Mr Chodiev is manifestly wrong and wantonly disregards Mr Chodiev's privacy rights, as well as the applicable French criminal law which protects the interests of a private individual pending the conclusion of an (alleged) investigation. For World Check to maintain its credibility, it must also protect and uphold the presumption of innocence which it has failed to do here by publishing a prejudicial Report.

11. In light of World Check's email dated 26 August 2020 refusing to remove the Report, our client is left with no option but to formalise its rights and objections into this pre-action letter. Whilst this letter initially addresses the obvious breaches of data protections laws, please note that all of Mr Chodiev's rights, in respect of any claim arising from improper use of his private information, are hereby preserved to the full extent of the law.

### WORLD CHECK'S OBLIGATIONS UNDER DATA PROTECTION LAWS

12. As an organization with its headquarters situated in London, World Check is subject to the provisions of the Data Protection Act 2018 ("DPA 2018"), which incorporates and supplements the GDPR.[9] The DPA 2018 sits alongside the GDPR and tailors how the GDPR applies as well as extends its reach via the "applied GDPR."[10] The two regimes must be read in tandem and thus will be treated as such herein.

13. The GDPR and DPA 2018 impose obligations with respect to *personal data*, which refers to "any information relating to an identified or identifiable natural person, ('data subject')".[11] Tribunals have recognized that information relating to a person's criminal convictions amounts to *sensitive personal data* that in principle qualifies for an extra layer of protection under GDPR Article 10 and DPA 2018 Section 10(4) and (5).[12] Further, Section 11 of the DPA 2018 clarifies that Section 10 of the DPA 2018 as well as Article 10 of the GDPR includes personal data relating to "(a) the alleged commission of offences by the data subject, or (b) proceedings for an offence committed or alleged to have been committed by the data subject or the disposal of such proceedings, including sentencing". Here the standard is indeed higher, because the Report seeks to draw an inference around a reported criminal *investigation* and not a criminal *conviction* (which would presumably be the result of a fair judicial proceeding on the basis of evidence).

14. As World Check's "Production Information" document admits, "*For the purposes of EU data protection laws, Refinitiv Limited[13] acts as controller of personal data in the World-Check database*". Indeed, under the GDPR, data *controller* means "*the natural or legal*

---

[9] **GDPR**, at art. 3; **DPA 2018**, at § 207.
[10] **DPA 2018**, at §§ 1-2, 21-22.
[11] **DPA 2018**, § 3(2); see also **GDPR**, at art. 4(1).
[12] See, e.g., *CJ v. Secretary of State for the Home Department* [2019] UKUT 00126(IAC) (treating such information as sensitive personal data; indeed, it was common ground it was appropriate to do so).
[13] World Check is a wholly owned subsidiary of Refinitiv Limited. Refinitiv Limited is a partially owned subsidiary of Thomson Reuters. Collectively, World Check, Refinitiv Limited, and Thomson Reuters are referred to hereinafter as "World Check."

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 5

> *person, public authority, agency or other body which, alone or jointly with others, determines the purposes and means of the processing of personal data*".[14]  Further, *processing* data means "*any operation or set of operations which is performed on personal data or on sets of personal data*", which is what World Check does.[15]  These definitions are identical for present purposes under the DPA 2018.[16]

15. Given that World Check is a data controller with respect to the personal data contained in the Report, Article 5 of the GDPR (and thus the DPA 2018) requires a lawful basis to do so. It also requires that the accuracy of the information contained therein be thoroughly vetted and removed if inaccurate:

    *(a) processed lawfully, fairly and in a transparent manner…*

    *(d) accurate and, where necessary, kept up to date; every reasonable step must be taken to ensure that the personal data that are inaccurate, having regard to the purposes for which they are processed, are erased or rectified without delay.*[17]

16. Therefore, World Check must process Mr Chodiev's data both lawfully and accurately. World Check's failures with respect to each of these mandates are explained in turn in the following.

    (A) <u>Lawful Basis for Processing</u>

17. World Check has not identified the lawful basis for the Report, and had instead offered vague generalities about the importance of World Check's services to assist its clients. World Check's decision to reinstate the Report is evidently not covered under the six potential lawful bases set out in Article 6 of the GDPR, which indicate the lawfulness of processing under the DPA 2018 as well.[18]  As stated above, Mr Chodiev has not consented to the use of his personal information and has objected to the Report demanding its erasure.[19]  For avoidance of doubt, Mr Chodiev maintains this objection and this letter is to be regarded as another request for World Check to cease processing his personal information, as well as to cease and desist publishing the current Report. There is no contract between World Check and Mr Chodiev does not permit publication of his personal information in the Report,[20] nor is World Check – the controller with respect to the Report – under any legal obligation to process Mr Chodiev's personal data.[21]  The Report is also

---

[14] **GDPR**, at art. 4(7).
[15] **GDPR**, at art. 4(2).
[16] **DPA 2018**, at § 3(4) ("*Processing', in relation to information, means an operation or set of operations which is performed on information, or on sets of information…*"); **DPA 2018**, at § 6 (expressly adopting the definition of "controller" in Article 4(7) of the GDPR subject to exceptions not relevant here).
[17] **GDPR**, at art. 5(1).
[18] See also **DPA 2018**, at §§ 1-2, 21-22.
[19] **GDPR**, at art. 6(1)(a).
[20] **GDPR**, at art. 6(1)(b).
[21] **GDPR**, at art. 6(1)(c).

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 6

not necessary to protect the "vital interests" of any natural person, which is satisfied only in the context of a matter of life or death.[22]  Moreover, the Report does not satisfy any circumstances constituting processing in the "*public interest*" per Section 8 of the DPA 2018.[23]

18. The final lawful basis in Article 6(1)(f) likewise does not permit World Check to publish the Report, which from language in World Check's website and Ms Kemp's emails appears to be World Check's asserted basis here.  As elucidated by Information Commissioner's Office ("ICO") Guidance, World Check's reliance on the purported "*legitimate interest*" basis is construed by a three-prong test, which requires affirmative answers to the following questions:

    (1) whether the processing is in pursuit of a "*legitimate interest*";
    (2) whether the processing is "*necessary*" for that purpose; and
    (3) whether the data subject's interests override the legitimate interest.[24]

19. Notwithstanding the ICO's admonitions – including that by "*choos[ing] to rely on legitimate interests, [World Check is] taking on extra responsibility for considering and protecting people's rights and interests*"[25] – World Check seemingly ceased conducting the test after step one.  Even assuming the Report was published to further "legitimate interests" (which is contested), the Report is not "*necessary*", as that term has been described by the ICO.  To be "necessary", the processing must be done in the least intrusive means possible while furthering the purported legitimate interest in a reasonable manner.[26]  It is unclear how the spreading of unsubstantiated and factually inaccurate information satisfies this requirement.  The only seeming purpose of the Report from World Check's perspective is to justify its own for-profit commercial product which it provides not in the public domain but to its paying subscribers. Commercial interest is not "necessary" especially given the detrimental effect on the data subject it creates.

20. Finally, World Check's customers' purported interests in the publishing of the Report cannot outweigh Mr Chodiev's interests in its removal.  According to an authoritative publication of the  Article 29 Working Party[27] the first step in carrying out the balancing test is to look at the nature and source of the legitimate interests on the one hand, and the impact on the rights of the data subjects on the other hand.[28] After analyzing the two sides

---

[22] **GDPR**, art. 6(1)(d); see also **GDPR Recital 46**.
[23] **GDPR**, art. 6(1)(e).
[24] **ICO, "**Guide to the General Data Protection Regulation" at pp. 78-79.
[25] *Ibid*. at p. 77.
[26] See, e.g., **European Data Protection Supervisor**, "Assessing the necessity of measures that limit the fundamental right to the protection of personal data: A toolkit"
[27] The Article 29 Working Party is the forerunner of the European Data Protection Board ("EDPB") and whose publications have been adopted, in part, by the EDPB and the ICO.
[28] **Article 29 Working Party**, "Opinion 06/2014 on the Notion of Legitimate Interests of the Data controller under Article 7 of Directive 95/46/EC", at p. 33.

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 7

against each other, a provisional balance should be established.[29] The balancing exercise must take into account the reasonable expectations of data subjects, based on their relationship with the controller.[30] Thus, if there is no relationship between the individual and the controller (as is the case between World Check and Mr. Chodiev) then this will make the balance tilt more towards the interest and rights of individuals. If data subjects do not reasonably expect further processing (ie processing for an *additional* purpose other than the one for which data have been originally collected), the interests and fundamental rights of the data subject could, in particular, override the interest of the controller.[31]

21. Here, the balance of interests tilts in Mr Chodiev's favour because, *inter alia*:

- French law requires that any information about criminal investigations remain confidential, which recognizes the potential harm to Mr. Chodiev's reputation and the prejudicing of the fair process, especially the presumption of innocence;

- the staleness of the so-called "Kazakhgate" matter, as marked by the fact that it relates to purported events that are over a decade old, undermines its probative value; and

- the mere inclusion in World Check's database is incredibly prejudicial, because World Check creates records only when there is an inference of a due diligence "red flag". There is no "neutral" perception which can derive from World Check's Report. Indeed, and business counterparts of Mr Chodiev have already begun to make adverse inferences after seeing the Report. As soon as a Report appears on World Check relating to Mr Chodiev, it will be communicated to third parties, including corporate services providers, banks, law firms, audit and accountancy firms with which Mr Chodiev works and which pay for access to World Check's database. Furthermore, this Report affects not only Mr Chodiev's business activities, but also his personal activities, including his banking arrangements as well as, potentially, those of his immediate family members. The "ripple-effect" of a Report such as this on Mr Chodiev's legitimate business activities cannot be underestimated. The time and expense which has already been incurred to explain and correct such a Report is considerable. Until the Report is removed, this process will be on-going and the damage to Mr Chodiev's reputation, as well as the cost of defending it, will continue to accumulate.

22. Ultimately, however, when faced with an objection under Article 21, the GDPR places the burden of proof on World Check with respect to its asserted lawful basis, and creates presumption in favour of Mr Chodiev (as the data subject) by obliging the controller to demonstrate "compelling legitimate grounds for the processing"[32] his personal

---

[29] *Id.* at p. 34.
[30] GDPR RECITAL 47.
[31] *Ibid.*
[32] *See also* **EDPB**, "Guidelines 5/2019 on the Criteria of the Right to be Forgotten in the Search Engines Cases Under the GDPR", at p. 8.

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 8

information. Accordingly, it is not for Mr Chodiev to establish why the Report violates the GDPR; rather, World Check must establish why it does not. World Check has not even attempted to explain how it has complied with the GDPR in the totality of the correspondence to date. Mr Chodiev is thus entitled to the erasure of the Report under the DPA 2018 (by virtue of its incorporation of these GDPR provisions).

    (B) Accuracy

23. In her letter of 24 August 2020, Ms Maguire identified the many reasons to doubt the veracity and relevance of the three initial articles cited by World Check. As explained above, Ms Maguire is under restriction of French law as to the extent to which any purported investigation can be discussed. World Check has been on notice of the same confidentiality restriction. Rather than acknowledge it, you responded by supplying four additional articles, each of which suffers from the same deficiencies as the first three: each of the articles regarding the alleged French investigation was published on either 25 or 26 September 2020, and critically, none of the articles identifies a source of the allegations, credible or otherwise. Indeed, even if the information contained therein were true, it would have been obtained in violation of French law.

24. None of the articles offer any indicia of accuracy. World Check appears to be cognizant of the importance of proof, even requesting Mr Chodiev to supply "*official documentation*" establishing the non-existence of a French investigation. World Check thus attempts to transmute its burden under the GDPR to ensure its publications are accurate into an obligation on Mr Chodiev to prove the inaccuracy thereof which is contradictory to the framework established by the GDPR and adopted by the DPA 2018 (see above).

25. The GDPR and the DPA 2018 require World Check to take "*every reasonable step*" to ensure the accuracy of the Report – a duty World Check has left unfulfilled. World Check's due diligence consists of finding a total of seven articles. One of these articles has nothing whatsoever to do with allegations of a French investigation and instead comments on Mr Chodiev's storied career. The other six articles are factually incorrect and/or based on illegally obtained information and thereby constitute publications by unscrupulous organisations and are in their own right a breach of the GDPR.

26. The only reasonable step that can be taken to ensure the accuracy of the report is to obtain "*official documentation*" regarding the existence of a French investigation which is essentially the first step World Check should have taken before reinstating the Report. French law strictly prohibits the dissemination of such information and therefore, it is impossible to verify the accuracy of the Report, meaning it is necessarily impossible for World Check to fulfill the accuracy requirement. Accordingly, the Report should have never been published and now continues to be published in breach of the law.

27. The substance of the Report requires World Check to satisfy the heightened requirements imposed under Article 10 of the GDPR and Section 10 of the DPA 2018. As the Report

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 9

    pertains to the "*alleged commission of offences by [Mr Chodiev]*" and "*proceedings for an offence committed or alleged to have been committed by [Mr Chodiev]*",[33] World Check must also prove that (1) the processing was "necessary for reasons of **substantial public interest**"; and (2) that it maintains an "*appropriate policy document*".[34]

28. In light of the above, World Check is in breach of its obligations under both the GDPR and the DPA 2018 with respect to the Report. However, the violation of the rule of law does not end there. Further under the GDPR (and the DPA 2018), Mr Chodiev objected to the Report pursuant to Article 21 and demanded its erasure under Article 17. As there is no lawful basis for processing Mr Chodiev's personal data, the Report must be removed pursuant to Article 21(d). Moreover, because Mr Chodiev has objected and World Check has not (and cannot) "demonstrate[] compelling legitimate grounds for the processing which override the interests, rights and freedoms of [Mr Chodiev]", World Check must delete the Report pursuant to Article 17(1)(c).

29. As guidance from the EDPB has made clear, when World Check receives a request for erasure based on the data subject's particular situation, it must now erase the personal data, pursuant to Article 17(1)(c) GDPR, unless it can demonstrate "**overriding** legitimate grounds" for the listing of the specific search result, which read in conjunction with Article 21.1 are "compelling legitimate grounds (…) which override the interests, rights and freedoms of the data subject."[35] Accordingly, the Report must be deleted under the DPA 2018 (by virtue of its incorporation of the GDPR).

30. Further, the Report has already had a negative effect on Mr Chodiev, who has needed to field professionally damaging queries from business counterparts. Pursuant to Article 82 of the GDPR (and thus to the DPA 2018), Mr Chodiev will seek and recover full recourse for damages suffered as a result of the Report. As already explained, Ms Maguire engages with queries raised by third parties in order to clarify and reassure the counterparts that the content of such a Report should not affect the existing relationship with Mr Chodiev. However, on some occasions business counterparts have been made anxious by the insinuations of such a Report, and this has led to closure of bank accounts as well as termination of corporate services agreements with Mr Chodiev or with corporate entities owned by him. Unsurprisingly, therefore, given the gravity of the consequences, until this Report is deleted, Mr Chodiev had no choice but to instruct external counsel, Diamond McCarthy LLP to defend his reputation. This exercise, whilst worthwhile and necessary, comes at a significant cost which Mr Chodiev will, inter alia, be seeking to recover from World Check.

REMEDY

31. We again request that World Check immediately removes the Report of Mr Chodiev from

---

[33] **DPA 2018**, at §§ 10-11; see also **GDPR**, at art. 10.
[34] **DPA 2018**, at Schedule 1.
[35] *Ibid.*

**DIAMOND MCCARTHY LLP**
September 11, 2020
Page 10

    its database.

32. We request that you confirm that Mr Chodiev's Report has been retracted by the date requested in this letter. Given the sensitivity of the information and the fact that World Check is already aware of the matters in dispute from previous correspondence, we request a prompt and substantive response by such time. If you fail to do so, we are instructed to commence legal proceedings. Any failure to comply with the pre-action protocol may result in sanctions to be applied against world Check, which may include in order to pay our client's costs.

33. All our client's rights are reserved.

                                      Yours faithfully,

                                      Diamond McCarthy LLP