# EXHIBIT H

# swanturton

Solicitors

Third Floor
8 Baltic Street East
London EC1Y 0UP

T: +44 (0)20 7520 9555
F: +44 (0)20 7520 9556

www.swanturton.com

Your Reference:
Our Reference: CXF/JG/REU010019

Diamond McCarthy LLP
295 Madison Ave.
27th Floor
New York
NY 10017
USA

**BY EMAIL ONLY TO:**
juliya.arbisman@diamondmccarthy.com
courtenay.barklem@diamondmccarthy.com

30 October 2020

Dear Sirs

**Re: World-Check Report of Mr Patokh Chodiev ("the Report")**

We write further to your letter dated 14 October 2020.

Cutting through the rhetoric of that letter (such as our client's business model being "*rotten to the core*" and World-Check being a "*blacklist*"), your primary *legal* argument, as we understand it, is that the Report is still in breach of Article 6(1)(f) GDPR. In addition, you maintain inaccuracy and you purport to have provided an "*exposition*" as to the alleged harm the Report has caused your client.

We confirm our instructions below.

<u>Lawful processing</u>

Our client remains satisfied that its processing falls squarely within Articles 5 and 6 GDPR: It processes data pursuant to Article 6(1)(f) GDPR on the basis that it is necessary for the legitimate interest of providing a service which assists subscribers with due diligence and other screening activities in accordance with their legal and regulatory obligations.

Further, the type of data our client processes can at times include special category data, which our client processes in the substantial public interest pursuant to Article 9(2)(g) GDPR – and more specifically in the interest of preventing and detecting unlawful acts, protecting the public, regulatory requirements, preventing fraud and/or terrorist financing or money laundering (in line with conditions 10, 11, 12, 14 & 15 of Part 2, Schedule 1 DPA 2018). We should add here that in the course of drafting the DPA 2018, the Department for Digital, Culture, Media & Sport consulted our client to ensure that the scope of Part 2 of Schedule 1 was sufficient to cover the processing of data in services such as World-Check.

Nonetheless, our client maintains that its data processing is necessary for the legitimate interests being pursued. The processing of personal data in the substantial public interest cannot effectively be undertaken with anonymised data. As we have tried to explain previously, that would render any data useless to our clients' subscribers, in their compliance with national and international anti-money laundering and counter-terrorist financing regulations.

Swan Turton LLP is a limited liability partnership registered in England with registered no. OC348685
A full list of members is available for inspection at the above address
Authorised and regulated by the Solicitors Regulation Authority
VAT Registration number GB 864072618

Notwithstanding that, as we understand your principal argument in relation to 'necessity', you are contending that the Report (as an example of the World-Check service) cannot be described as *necessary* because the information reported is already in the public domain. Therefore, on your logic, "*World-Check customers would be better off saving their money and simply conducting the Google searches themselves*". We suspect that such an assertion on your part may have been intended for effect as opposed to substantive legal argument, particularly because you will appreciate that the world's financial institutions conduct millions of screenings per day and, therefore, completing due diligence in the way you have described would be wholly unfeasible. But for the sake of completeness, we confirm that our client's aggregation of public information acts as a convenient digest of data and a tool to be used by its subscribers as part of their due diligence and screening processes (in line with their legal and regulatory requirements).

Within that context, World-Check's caveats and disclaimers are incorporated into terms of business and data subject reports themselves to protect the data subject and ensure that any readers of any report do not rely solely upon the aggregated material. Your allegation that "*it strains credulity to believe that world check's customers in fact obey and follow these "limitations", or even to believe that they could be reasonably expected to do so*" is denied. Not only is your position unsubstantiated, but it questions the integrity of the global financial system by suggesting that major financial institutions rely solely upon World-Check in their decision making, ignoring all and any other applicable laws and regulations, including financial inclusion requirements.

Finally we remind you that our client's commercial interest in World-Check is not a bar to the necessity and legitimacy of its processing under data protection law. Should your client nevertheless pursue that line of argument, we trust that you will provide us with the statutory authorities to support it.

<u>Alleged Harm</u>

You open your latest letter with the proposition that you intend to detail the damage you say has been caused in this matter, and you in fact close it with the assertion that you have provided an "*exposition of the harm occurring as a result of the Report*". However, you have not elucidated the position (as you assert) in any respect. As we see it, you have barely asserted that "*it was not until the Report that Mr Chodiev began fielding concerns from counterparties*" and loosely referenced banks in Luxembourg and Switzerland; "*different shareholders*"; a charitable foundation and "*a firm of accountants*".

That is not evidence, and as we have tried to explain previously, should your client pursue this matter through the Court system (as you continue to threaten) any judge will expect him to at least provide:

1. The names of the banks he asserts have closed accounts as a direct result of the Report.
2. Confirmation from those banks that they did in fact close accounts as a direct result of the Report.
3. The names of all and any business counterparts that have made adverse inferences about your client as a direct result of the Report.
4. Evidence from those business counterparts they did in fact draw such adverse inferences and what those alleged adverse inferences are.

Not least because you have not provided any documentation or correspondence from any of these alleged individuals or entities (to establish a direct causal link between any alleged harm and the Report), our client must conclude that your client is either unwilling or unable to do so. In the event that your client nevertheless seeks to take this matter any further, we trust you will provide us with information to support his allegations, in which circumstances our client could review the position.

Finally, we note your assertions that World-Check "*improperly and unreasonably includes people*" based on religion, race, ethnicity or national origin. That is patently incorrect and you have provided no evidence to support what we consider to be offensive and serious allegations.

Alleged inaccurate and unreliable data

We note that whilst you accept that your client's allegations are a matter of public record <u>and</u> that the Report has aggregated the same, you alleged that (in summary) the Report is misleading, and that World-Check has failed to take "*every reasonable step*" to ensure the accuracy of the Report. However, save for alleging that the Report is "*scant and superficial*" and/or "*deficient*" (and that the relevant French publishers are "*unscrupulous*"), you do not confirm what is allegedly inaccurate about it. For example, it is unclear whether you are contending that:

a) Your client has never been under investigation in France for tax fraud (for example)
b) It has not been reported that your client is under such investigation
c) It has never been reported in the public domain that your client is/was under investigation
d) The information contained with the Report (i.e. that allegations have been reported via Wikipedia or otherwise) has been fabricated by our client.
e) The Report would be accurate if it included links to the "*Kazakhgate*" dossier and "*more recent and reliable findings*" you refer to.

As it stands, your client's complaint appears to be based on the singular proposition that by virtue of the fact that he denies the reported allegations (and believes that French publishers are "*unscrupulous*"), our client has published that yours is guilty of misconduct. That is patently incorrect and therefore we fail to see how any allegation, which appears to rely solely on inference, is sufficient to maintain that Article 5(1)(d) GDPR has been breached by our client.

Incidentally, in these circumstances where you have accepted that your client's allegations are in the public domain, we trust that your client has considered contacting the source material directly (be it the French press, Google or Wikipedia for example) to correct what you allege is factually incorrect and/or misleading or otherwise in the public domain.

Finally, we note your request for an explanation as to our client's alleged "*urgency to post its Report*" and "*why that was more important than ensuring the integrity and accuracy of the Report*". To confirm, our client remains satisfied that the Report is accurate and that (as previously explained) our client provided your client's former legal advisor with sufficient time to comment on the latest version of the Report.

Additional note

We note your consideration of our client's offer to add a note to the Report as a 'concession'. However, for the avoidance of doubt, it was not. Rather, as we have tried to explain previously, our client is always open to considering any proposed note and/or comment a data subject would like to make to allay any concerns they may have regarding information contained in World-Check.

To that end, our client intends to include the following Additional Note in the Report to represent your client's position: **"World-Check has received representations from the data subject that (i) the sources included in the report contain factually incorrect information; and (ii) he denies any allegations of wrongdoing. Further information should be sought from the data subject."**

Should your client like to propose an amendment to the above wording, please confirm the same by 6 November 2020 and we will take our client's instructions accordingly.

In addition, as our client is always open to considering any new information for the purpose of ensuring that World-Check can be updated where appropriate, we also invite you to provide this firm with the "*Kazakhgate*" dossier and the "*more recent and reliable findings on the topic*" to which you refer for our consideration.

DSAR

You assert that our client's provision of information on 18 October 2020 was "*woefully inadequate*" by reference to "*missing gaps*". We address these alleged 'gaps' as follows:

1. Our client removed all of your client's personal data from World-Check in 2014. The Report was recreated and reinstated on 17 August 2020. Before this time, your client's name (by way of any search against his name in World-Check for example) produced a nil search result. We enclose the 'nil search' result your client received on 23 October 2014. For the avoidance of doubt, the information provided on 25 September 2020 included historic versions of the Report held by our client for legal and audit purposes only.

2. Our client has renewed its search for any information held relating to the Report, including in its internal systems. We attach the resultant file of communications containing your client's personal information. With specific regard to the information contained in the document entitled "*Internal communication - Screening Online product*", please note that the queries raised related to the results of online media, accessed through a media search functionality contained within our client's Screening Online product. The function allowed subscribers (those with access to Screening Online) to conduct a name search and access potentially relevant media articles available in the public domain at the time the search was conducted. This data was not therefore held by our client. Relevancy scores were provided to assist clients to determine if an article found in the public domain related to the person they were searching for. Please note that the Screening Online product is no longer sold or accessible to our client's subscribers.

3. There is no "*supporting analysis, internal correspondence, drafts, or other records*" in relation to the Report to disclose. Despite your view that it "stretches credulity", the Report is a standalone document.

Turning to your recent request for "*policies and procedures*", we trust that you have advised your client that neither s.7 DPA 1998 nor Article 15 GDPR require any data controller to provide any such "*internal documents and training materials about controlling and processing data and about internal workflow and decision making when identifying, creating, and approving a potential report*". Not least because even if any such documents existed they would be confidential, our client will not be providing them. To be clear, Article 15 provides your client with a right of access to personal data and any material which specifically relates to it.

As your client's request for information dated 18 September 2020 goes beyond the type of data held in World-Check or our client's other risk products (including its EDD service), we confirm that we are not instructed to deal with this request. We can confirm however that our client has sent your request to its Data Privacy office, who will contact you separately in this regard. It should nevertheless be noted that our client cannot provide any data held by Thomson Reuters, given that Refinitiv Limited and Thomson Reuters are separate companies.

In these circumstances where your client has now been provided with all information held by our client in connection to its World-Check product, our client believes that the information it has disclosed to date meets the requirements of Article 14(1) and (2) GDPR. Should your client therefore make an application to Court in relation to further information our client is not obliged to provide (for the reasons we have explained), this letter will be drawn to the Court's attention on questions of costs.

<u>Conclusion</u>

In these circumstances where our client's business activity is important to the global financial system and the Report is processed for the legitimate, specific and limited purpose of screening for the prevention of financial crime and serious misconduct (contexts in which the legitimate interests condition at GDPR Article 6(1)(f) shall be relied upon), we take this further opportunity to invite your client to withdraw his allegations. In addition to providing your client with requested documents, our client has now repeatedly confirmed its substantive position this matter. As to that, should your client take the ill-advised step of issuing proceedings, again, this letter will be drawn to the attention of the Court on any questions of costs.

Yours faithfully

**Swan Turton LLP**
Encs.