# EXHIBIT O

**swanturton**

Solicitors

Your Reference:
Our Reference: REU010019

Diamond McCarthy LLP
295 Madison Ave.
27th Floor
New York
NY 10017
USA

Third Floor
8 Baltic Street East
London EC1Y 0UP

T: +44 (0)20 7520 9555
F: +44 (0)20 7520 9556

www.swanturton.com

**BY EMAIL ONLY TO:**
juliya.arbisman@diamondmccarthy.com
courtenay.barklem@diamondmccarthy.com

22 January 2021

Dear Sirs

**Re: World-Check Report of Mr Patokh Chodiev**

We write further to your letters dated 7 January 2021 and 24 November 2020.

Unhelpfully, your letter dated 24 November 2020 reads as if it were prepared before your firm considered ours dated 23 November 2020, to the extent that it largely repeats arguments introduced by your firm on 10 November 2020. Nonetheless, in an on-going attempt to engage with you in this matter, with the ultimate aim of avoiding the litigation you continue to threaten, we revisit and readdress points you have raised - so that at the very least the Court will see in due course that we have exhausted all and any scope to co-operate with you in relation to disclosure or otherwise.

Before we confirm our instructions however we should address a several preliminary points which we believe are protracting this matter and impeding any scope for resolution of this dispute:

*"Thomson Reuters"*

In the further interest of avoiding unnecessary costs and proceedings (and again to assist the Court in due course if necessary), we confirm that:

1. World-Check, operated and controlled by our client, Refinitiv Limited (formerly named Reuters Limited), formed part of the Finance and Risk ("F&R") business of Thomson Reuters Corporation ("TRC") until 1 October 2018.
2. The F&R business, including Refinitiv Limited and the World-Check product, was acquired by The Blackstone Group in October 2018 (*https://www.reuters.com/article/uk-thomsonreuters-m-a-blackstone/thomson-reuters-closes-deal-with-blackstone-idUKKCN1MB3Q6?edition-redirect=uk*).
3. The F&R business was renamed Refinitiv on completion of the acquisition by The Blackstone Group (and Reuters Limited was subsequently renamed Refinitiv Limited).
4. TRC is a now only a shareholder in Refinitiv (including Refinitiv Limited).
5. TRC and Refinitiv Limited are completely separate legal entities.
6. TRC is unconnected to World-Check.
7. Refinitiv Limited is the data controller of World-Check.
8. World-Check is a risk intelligence database and not a legal entity.
9. Our client is not a 'joint-controller' with TRC and/or any other entity.
10. There is no "*true relationship*" to expose between our client and TRC, nor is there any "*corporate veil to avoid liability*".

We trust this clears up any confusion in relation to the ownership of World-Check by Refinitiv and confirms that it is not TRC or 'Thomson Reuters'.

Swan Turton LLP is a limited liability partnership registered in England with registered no. OC348685
A full list of members is available for inspection at the above address
Authorised and regulated by the Solicitors Regulation Authority
VAT Registration number GB 864072618

*Disclosure to date*

As explained on 23 November 2020, there are no additional or ancillary documents created in and around the Report. To confirm:

1. World-Check analysts input their findings directly into World-Check in line with stringent guidelines. Information is inputted and updated in World-Check on a proactive basis (in accordance with specific policies designed to ensure fairness and proportionality of the data). The Report is no exception.

2. Beyond the versions of the Report, and as you have seen from disclosure, there has been limited data processed by our client in and around the inclusion of your client's information in World-Check.

3. The Report is a standalone document, and was created without the attendant preparatory drafts you believe exist.

4. Your client is not entitled to any information that is privileged and any such information does not fall to be disclosed under a DSAR.

Turning to your request for information concerning the "trigger" for the inclusion of your client's personal information in World-Check in 2020, our client has conducted a further check of information held and has discovered that it inadvertently failed to provide additional documents in response to your client's subject access request.

From the additional emails and messages (please see (A) of Appendix 1 within the enclosed 'Additional information') dated 31 July 2020, you will note that the "trigger" was the discovery of the following article:

**https://www.lecho.be/economie-politique/belgique/economie/patokh-chodiev-inculpe-en-france-pour-blanchiment/10166096.html**

You will also note that additional emails and documentation have been found by our client and, by way of explanation, we confirm that the information included at (A) of Appendix 1 is held in an internal email messaging system that our client believed had been checked. Upon making further enquiries concerning the "trigger" however, the additional information was found. The information at (B) of Appendix, and the article enclosed (as 'Article mentioning subject'), was found in email communications concerning a third party.

Our client has instructed us that it has already taken appropriate steps in relation to these gaps in disclosure, including improving its internal processes to ensure that this oversight will not happen again. Our client nevertheless sincerely apologies for the delay in providing this additional information and is now satisfied that your client has received the data to which he is entitled from the date the Report was created to the present day.

*Alleged "undue influence" by third parties*

Whilst it is encouraging that, from the perspective of the accuracy of the public domain information within the Report, you appear to accept that any World-Check subscriber is likely to already have an opinion on your client (based on the available negative news stories in the public domain), it is unclear how you have misconstrued our client's disclosure of 30 October 2020 to conclude that:

1. "*customers/subscribers of World Check can influence or initiate reports on other people*".
2. "*World Check's much vaunted objectivity and accuracy can be subverted by persistent or import clients*"
3. "*it raises suspicion as to whether World Check is complicit with its "client" or turning a blind eye to possible disinformation*"

To be clear, subscribers of World-Check are at liberty to pose queries to our client and likewise our client is at liberty to consider any information which is brought to its attention. In the number

of instances disclosed, it is apparent that World-Check subscribers (in the process of undertaking their own due diligence on your client and/or Eurasian Resources Group) were querying why your client was not in World-Check at that time due to what they were seeing in the public domain.

Irrespective of the interpretation you would prefer to apply to our client's disclosure, it takes its data processing obligations very seriously and operates World-Check pursuant to applicable data protection law. For the avoidance of any doubt, the customer service individual you have suggested eventually 'cracked' under the pressure of subscribers (incidentally, via the old Thomson Reuters email address for World-Check personnel) said:

> "*A profile was created…However, we decided to remove the profile due to the following reasons:*
>
> - *He is not a PEP (doesn't hold any PEP position and we have no solid/official proof of him being related to other PEPs).*
> - *He has no recent risk information reported. Negative media refers to charges of corruption in 2011 and those judges [sic] were dropped at that time.*
>
> *Currently, we do not have any reason to reinstate/create a World-Check profile for the reported individual.*
>
> *It is our responsibility under Data Protection laws only to publish the most up to date information and to delete and no longer make available anything that is out of date about any particular data subject.*" (Our emphasis)

Within that context, there is no basis for any of your rhetoric above, particularly considering that the information provided could only, on any reasonable view, serve to create a positive impression of your client in the circumstances of the request. Nevertheless, we are confident that any Court hearing your allegations would not reach the "*inevitable conclusion*" you have in an apparent attempt to bolster your case. In other words, our client remains satisfied that its data processing falls squarely within the provisions of the DPA 2018 and that there is no evidence whatsoever of it bending to any alleged 'undue influence'.

*Threatened US proceedings*

In these circumstances where your client has intimated a claim against a UK registered data controller for breaches of the DPA 2018/GDPR, it is unclear why you continue to threaten proceedings in the US. Nonetheless, should any proceedings be issued in the US we hold instructions to immediately seek to strike them out on jurisdictional grounds. For the avoidance of any doubt, our client is the *only* data controller for the purposes of data protection and/or any complaints any data subject may have regarding World-Check. As confirmed above, TRC and Refinitiv Limited are separate legal entities and TRC is unconnected to World-Check.

*Outstanding information*

In our client's Protocol response of 25 September 2020, we explained that your client's case on inaccuracy lacked clarity and posed queries which remain unanswered. We should therefore be grateful if you would clarify whether your client is contending that:

a) he is not under investigation in France;
b) the information contained within the Report is not in the public domain;
c) the information contained with the Report has in any way been fabricated by our client.

We look forward to receiving your client's responses shortly.

Further disclosure

We maintain that our client is not obliged, pursuant to the GDPR and/or the DPA 1998 or 2018, to provide your client (nor any data subject for that matter) with any further disclosure. As we have tried to explain previously, the data protection laws require a data controller to provide a data subject with copies of any personal data processed by the data controller; confirmation of the categories of receipts to whom that data may have been disclosed, and where possible,

confirmation of the envisaged period for which the personal data will be stored or, if not possible, the criteria used to determine that period. Our client has now provided all of that information to you. Nowhere within Article 15 GDPR does it require any data controller to disclose the type of internal and/or confidential information you appear to be requesting and/or believe you are entitled to see.

Your letter of 24 November 2020 echoes arguments in relation to Article 15(h) and Recital 63. However, and again as previously explained, Article 15(h) provides for access to data which is processed by way of automated decision-making and as our client does not rely upon any automated decision making in producing World-Check reports (and therefore your client has never been subjected to processing in respect of Article 22(1) GDPR), Article 15(h) is irrelevant.

Again, to repeat what has already been explained, Recital 63 refers to a general right of access to personal data under the GDPR. Our client has complied with its obligations in this regard and we therefore do not understand why it is being cited to support an argument that your client is entitled to internal and/or confidential documents and/or anything else beyond the scope of Article 15.

You have seen the personal data held by our client and you have received our client's substantive arguments to support its case on lawful data processing. To be clear, any substantive defence that our client is required to file and serve in this matter will rely upon the relevant statute it has cited and the facts in this case. As to that, the information provided to date should be more than sufficient to enable your client to assess his position in relation to the Report/his personal data as anticipated by the data protection law and the Protocol.

Nevertheless, it remains our client's view that any disclosure exercise between a data controller and a data subject should be a collaborative process, particularly in these unique circumstances where you continue to seek the widest parameters of disclosure based on suspicions (which are just that and without any foundation). Our client is therefore looking to engage with you on any further disclosure, however you would need to be prepared to collaborate to clarify your requests.

For example, "*internal documents and training materials about controlling and processing data and about internal workflow and decision making when identifying, creating, and approving a potential report*" is not helpful. It is not a class or category of document and we are concerned that the scope of the request is so wide as to be almost impossible to comply with. It is not even possible at the moment to determine whether the documents you seek would fall within standard disclosure, nor whether they are privileged or even exist.

Any attempt to search for and identify documents on the present basis raises obvious issues in respect of proportionality - and we are confident that should you proceed to Court with the same request it would not satisfy a pre-action disclosure application. That is particularly in the wake of *Carillion PLC (In Liquidation v KPMG (2020) EWHC 1416 (Comm)* wherein the High Court confirmed that potential claimants cannot exploit pre-action protocols to engage in a 'fishing expeditions' to force potential defendants to provide information to help the claimants identify a case.

We therefore invite you to set out what documents you think exist and are 'disclosable'. Until and unless we understand exactly what it is you seek, there is certainly no prospect of providing any alternative explanation of internal policies or procedures as you suggest.

<u>Conclusion</u>

You continue to threaten litigation in multiple jurisdictions. We have tried to engage with you and therefore we can only invite you to abandon your unnecessarily aggressive position before significant time and costs are incurred. In the event that your client ignores this letter and proceeds to an application for disclosure as threatened without making any attempt to co-operate, we reserve the right to refer this letter to the Court on questions of costs.

Yours faithfully

**Swan Turton LLP**
Encs.